# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
MARY M. GIORDANO RUPPERT,                )
          Plaintiff,                )
     v.                                )
                                    )   Case No. 20-cv-3725 (CKK)
KILOLO KIJAKAZI,[1]                       )
Acting Commissioner of                    )
the Social Security Administration,       )
                                     )
          Defendant.                )
_____ )

## MEMORANDUM OPINION
(April 11, 2022)

Pending before this Court are Plaintiff's [15] Motion for Judgment of Reversal (Pl.'s Mot.) and [15-1] Statement of Points and Authorities in support thereof ("Pl.'s Stmt."); Defendant's [16] Contested Motion for Entry of Judgment with Remand ("Def.'s Mot.") and Defendant's [17] Memorandum in support thereof ("Def.'s Mem."); and Plaintiff's [18] Reply in Opposition to Defendant's Motion for Remand ("Pl.'s Reply").[2] Plaintiff Mary Giordano Ruppert ("Plaintiff or "Ms. Ruppert") was previously before this Court with a complaint based on the initial denial of her claim for disability insurance benefits by Administrative Law Judge ("ALJ") Andrew Emerson. _See generally Ruppert v. Berryhill_, Civil Action No. 18-0148. This Court granted in part and denied in part Plaintiff's Motion for Judgment of Reversal in that prior case. _See_ January

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as Defendant.

[2] In issuing this Opinion and the accompanying Order, this Court has considered the parties' motions as well as the entire Administrative Record in this case, ECF No. 11, and this Court's [19] Memorandum Opinion and [18] Order in Defendant's prior case, Civil Action No. 18-0148. When citing legal documents with reference to the Electronic Case Filing ("ECF") number, this Court refers to page numbers assigned by the ECF system.

13, 2020 Order, ECF No. 18 (Civil Action No. 18-0148).  The Court remanded the case to the Commissioner of Social Security for reconsideration of the following issues: (1) calculation of Plaintiff's time off work; (2) whether Plaintiff met Listing 4.05 requirements; (3) evaluation of evidence regarding Plaintiff's daily activities and the severity, intensity, duration and frequency of her disabling symptoms; (4) determination of Plaintiff's Residual Functional Capacity ("RFC") in light of her limitations; and (5) evaluation of weight given to treating physicians.  *Id.*[3]  The case was thereafter assigned to the same ALJ, who again denied Plaintiff's claim for disability insurance benefits, and that denial is pending before this Court in the instant case.

Plaintiff Mary M. Giordano Ruppert ("Plaintiff" or "Ms. Ruppert") requests reversal of that second decision by the Acting Commissioner of Social Security ("SS") denying her disability insurance benefits.  Plaintiff alleges that the Administrative Law Judge acted:

> in violation of a direct order of this Court and multiple agency regulations and rulings, [when he] erroneously failed to apply Ms. Giordano Ruppert's time off task.  His additional reversible errors include multiple misstatements of material fact, failure to assess the frequency and duration of symptoms, erroneously requiring objective corroboration of subjective symptoms, and failure to accord, at least, substantial weight to treating physician opinions.

Pl.'s Mot., ECF No. 15, at 1-2.  Plaintiff requests that this Court "find her disabled and [ ] remand the case to the agency for the award of benefits."  Pl.'s Mot., ECF No. 15, at 2.

Defendant proffers no argument to address any of the points made in Plaintiff's Motion but instead, Defendant requests that this Court "enter a judgment that reverses the final decision of the Commissioner and remands the case to the Commissioner for further administrative proceedings."  Def.'s Mot., ECF No. 16, at 1.  Defendant acknowledges that the ALJ failed to "calculate Plaintiff's

---

[3] The Court upheld the ALJ's Step 3 findings that Plaintiff' impairments did not meet or equal medically any of the listings; his articulation of findings regarding Listing 12.02; and any other aspects of the ALJ's decision that had not been challenged by the Plaintiff.  Memorandum Opinion, ECF No. 19 (Civil Action No. 19-0148), at 47.

time off work in accordance with this Court's January 13, 2020 remand Order" and failed to "evaluate Plaintiff's daily activities" and further failed to "evaluate the severity of Plaintiff's mental health impairments using the correct "paragraph B" criteria." Def.'s Mot., ECF No. 16, at 1-2.

For the reasons set forth herein, the undersigned finds that Plaintiff's arguments warrant reversal of the ALJ's decision and an award of benefits. Accordingly, the Court GRANTS Plaintiff's Motion for Judgment of Reversal, and DENIES Defendant's Contested Motion for Entry of Judgment with Remand, and REMANDS this matter to Social Security for calculation and award of disability insurance benefits. A separate Order accompanies this Memorandum Opinion.

### I. Background

This Court incorporates by reference the lengthy background section set forth in its January 13, 2020 Memorandum Opinion, ECF No. 19 (Civil Action No. 19-0148), at 2-21, which details the record evidence in this case. In that Opinion, this Court attempted to organize Plaintiff's voluminous medical records in chronological order, and the Court noted that Plaintiff's treating sources include: (1) Alan Weiss, M.D., internist; (2) Rhanni Herzfeld, M.D., neurologist; (3) Jessica Clark, Ph.D., neuropsychologist; (4) Marilyn Kraus, M.D., neurologist; (5) Robert Jacobs, O.D., neuro-optometrist at Developmental Optometry; (6) Maura Collins, speech language pathologist; (7) Dennis Fitzgerald, M.D., otolaryngologist; (8) Elizabeth Kingsley, M.D., cardiologist; (9) Heather Carr, D.P.T., physical therapist; (10) Heechin Chae, M.D., neurologist; and (11) Gregory O'Shanick, M.D., neuropsychiatrist and Medical Director at the Center for Neurorehabilitation. *See id.* at 4 n.4. In her Motion for Reversal of Judgment in this case, Plaintiff provides a summary history of her medical issues, with references to the Administrative Record in

this case.  The Court will reiterate that summary history in part herein, interspersed with a few relevant facts from its first opinion.

Plaintiff Mary M. Giordano Ruppert was 44 years old on her disability onset date of October 9, 2012.  (AR 36.)[4]   Plaintiff was a systems engineer and executive at Booz Allen Hamilton from July 1990 to October of 2012, with a one year break in 2000-2001, when she served as a vice president of public relations in a public relations firm.  ECF No. 19 (Civil Action No. 18-0148), at 2.  On March 10, 2014, Plaintiff filed an application for benefits under Title II of the Act, alleging disability due to Postural Orthostatic Tachycardia Syndrome ("POTS"), post-concussive syndrome, migraines, vestibular cognitive deficit, low blood pressure, diabetes insipidus, anxiety, depression, neuropathy, and fibromyalgia.  *Id.*  Prior to an automobile accident in April 2012, where Ms. Ruppert suffered a concussion, she had already been diagnosed with POTS, fibromyalgia, and small fiber neuropathy, but she was working with accommodations, including working at home one day a week and undergoing daily or near daily intravenous saline infusions— sometimes administered at her office — via an implanted "port catheter," in order to stabilize her blood pressure.  *Id.* at 2-3; *see also* AR 76, 330, 378, 421, 511, 516, 519.  Plaintiff attempted to return to work after the accident; however, by August 2012, her physicians recommended ceasing work due to her worsening symptoms.  ECF No. 19 (Civil Action No. 18-0148), at 3; *see also* AR 380.  Ms. Ruppert continued to attempt to work, but after a head injury/possible second concussion in October 2012, she ceased working in October of 2012.  *Id.* at 3; *see also* AR 330, 378, 380, 434, 698-699, 716.

---

[4] The Court references the page numbers located at the bottom righthand corner of the administrative record.

Plaintiff testified that her post-concussive routine was to use the morning hours to get daily tasks completed, AR 1609-1610, with rest every 10-60 minutes, AR 68, which totals approximately three hours a day, which the vocational experts during both hearings opined to be unacceptable in any workplace.  AR 76, 1635-1636.  Plaintiff's brain injury resulted in symptoms such as frequent brain fog, visual dysfunction, difficulty concentrating  and remembering, AR 2989, 2991, vestibular dysfunction with tested, abnormal sway and pressure, AR 410, 412, 415-418, 429-430, dizziness with nausea and vomiting, *id.*, migraines, heightened sensitivity to light and noise, and episodes of rage.  AR 380, 388, 2983-2994.[5]

The record indicates that Plaintiff was unable to remain on task mentally, with poor attention, poor memory, and slow mental processing.  AR 378, 384-385.  For Plaintiff, reading or using the computer for more than 15-20 minutes, bright or flickering lights, confused noise, or fatigue and stress could trigger migraines, rage, or collapse.  AR 324, 384-387.  Plaintiff also experienced plunging blood pressure when standing or walking, which resulted in sudden weakness and collapses.  AR 381, 429-430.

Plaintiff participated in cognitive therapy, physical therapy, vestibular exercise, and emotional therapy, AR 64, 422, as well as visual therapy and acupuncture.  AR 749-864, 1548-1549, 3448-3494.  Plaintiff was encouraged by her doctors to engage in some exercise, AR 363, 379-380, 1616, and she tried to walk more than 20 minutes a day, with rests after each 20-25 minutes.  AR 1628, 1630.  Plaintiff's ability to drive was limited to when she felt competent to do

---

[5] In his first HOD, the ALJ acknowledged that "claimant has a history of post-concussive syndrome, but [he found]it to be non-severe" based on certain diagnostic testing results and the fact that Plaintiff returned to work for 6 months after her first concussion.  AR 21.  The ALJ denied any diagnosis of "cognitive communications disorder," although he indicated that he considered "any difficulty communicating" in connection with Plaintiff's other physical and mental impairments.  *Id.* The ALJ found Plaintiff's history of migraines and her visual diagnoses to be non-severe.  *Id.*

so, and even then, she had to stop and rest, or have someone pick her up and collect her car.  AR

1614.  When she was able to travel, she was always exhausted and bedridden for at least a day

after arriving, AR 1627, 2316, and sometimes, she was unable to travel at all. AR 2987.

In 2016, Plaintiff's infusion port became infected, resulting in a serious blood infection,

AR 348, 359, 3017, 3054, 3155, 3164, 3185-3186, 3190-3191, and she had sepsis on several

occasions.    AR 3054, 3086, 3100.[6]    After that, Plaintiff's saline infusions became more

complicated and less frequent as insertions were done by needle, and there were difficulties with

access and positioning and stabilizing the needle, and deterioration of her veins.  AR 68, 1604,

1607-1609.

Plaintiff's application for disability benefits was denied initially and upon reconsideration.

Thereafter, Plaintiff requested an administrative hearing, and United States ALJ Andrew Emerson

held an administrative hearing and issued his Decision denying Plaintiff's application.   In both

Hearing Officer Determinations ("HODs"), AR 18-37 [first HOD] and AR 1563-1595 [second

HOD], the ALJ found that Plaintiff has the following severe impairments: degenerative disc

disease of the cervical spine; mitochondrial metabolic defect/Postural orthostatic hypotension

syndrome (POTS) with autonomic neuropathy, vestibular disorder, pseudobulbar affect, and

dysexecutive syndrome; diabetes insipidus/autoimmune disorder; status-post Bard Port catheter

implantation with Groshong catheter; depression; adjustment disorder; post-traumatic stress

disorder; and attention deficit disorder.  AR 20, AR 1569  In his second HOD, the ALJ  indicated

that Plaintiff had the RFC to perform "light work . . ., except she can [only] occasionally climb

ramps and stairs, balance, stop, kneel, crouch, and crawl [and] she can never climb ladders, ropes,

---

[6] The ALJ's first HOD noted that the cellulitis at Plaintiff's mediport site and her mediport
infection were "non-severe."  AR 21.

or scaffolds. AR 1573.  She can frequently rotate, flex, and extend the neck and . . . reach overhead

bilaterally." *Id.*  Furthermore, Plaintiff must avoid "concentrated exposure to extreme cold and

extreme heat, wetness, excessive noise, and excessive vibration" and "moderate exposure to

hazardous moving machinery and unprotected heights." *Id.*  Moreover, she "can only perform

simple, routine, and repetitive tasks in a low-stress (defined as no strict production quotas and no

assembly line pace work) work environment with only occasional interaction with supervisors, co-

workers, and the general public. *Id.*  Furthermore, "[c]hanges in work duties must be introduced

gradually." *Id.*  This was consistent with his finding in the first HOD.  AR 24.  Initially, the ALJ

concluded that Plaintiff could perform the requirements of light, unskilled work as a "merchandise

marker," "router," or "housekeeper."  AR 37.  Later, the ALJ concluded that Plaintiff could

perform the functions of light, unskilled work as a "router," a "checker," or a "marker."  AR 1583.

Plaintiff requested a review of the ALJ's first HOD, but the Appeals Council denied

Plaintiff's request for review.   Plaintiff then filed a complaint in this Court in Civil Action No.

18-0148, and as previously noted, this Court remanded the case for the ALJ to reconsider a number

of issues, including *inter alia*, his calculation of Plaintiff's time off work for medical and

professional visits; his assessment of Plaintiff's daily activities and analysis of the frequency,

duration, intensity and severity of her disabling symptoms; and the weight he gave to Plaintiff's

treating physicians.   On remand, the ALJ held another hearing, and he issued a second HOD,

dated October 16, 2020 (AR 1566-1584) denying again Plaintiff's claim for disability benefits.

Thereafter, Plaintiff filed the complaint in this proceeding.

## II. Standard of Review

Judicial review in Social Security disability cases is limited to courts determining whether

the Commissioner applied the correct standard and whether the Commissioner's findings are

supported by substantial evidence.  42 U.S.C. § 405(g).  The standard for substantial evidentiary

sufficiency "is not high" but instead is "more than a mere scintilla,"  which means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v.

Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).  The court may not substitute

its own judgment over that of the Commissioner.  *Chevalier v. Shalala*, 874 F. Supp. 2, 3 (D.D.C.

1994) (citing *Davis v. Heckler*, 566 F. Supp. 1193, 1195 (D.D.C. 1983)).  Generally, where "the

record before the agency does not support the agency action, if the agency has not considered all

relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on

the basis of the record before it, the proper course, except in rare circumstances, is to remand to

the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470

U.S. 729, 744 (1985).  Remand is appropriate in any case where an "ALJ could still find that

substantial evidence does not support a finding of disability."  *Workman v. Colvin*, 204 F. Supp.

3d 1, 5 (D.D.C. 2016).

A remand solely for the award of disability benefits is an extraordinary remedy that is

appropriate if "the evidence on the record as a whole is clearly indicative of disability and

additional hearings would serve no purpose other than to delay the inevitable receipt of benefits[.]"

*Espinosa v. Colvin*, 963 F. Supp. 2d 25, 35-36 (D.D.C. 2013) (quoting *Hawkins v. Massanari*, No.

00-2102. 2002 WL 379898, at *4 (D.D.C. Mar. 8, 2002).  When courts have granted an immediate

award of benefits, they have stated that "it would be virtually impossible for [the ALJ] to find

against [the] plaintiff upon remand."  *Lockhard v. Apfel*, 175 F. Supp. 2d 28, 34 (D.D.C. 2001);

*see Perkins v. Berryhill*, 379 F. Supp. 3d 1, 8 (D.D.C. 2019) (the standard for reversing a

Commissioner's decision and ordering an immediate award of benefits presents a "high bar").

### III. Plaintiff Challenges Defendant's Failure to Proffer any Legal Argument

Defendant asserts that where "the record as a whole is not clearly indicative of disability, [then,] an immediate award of benefits would be improper," Def.'s Contested Mot.,  ECF No. 17, at 4 (citation omitted); *see Amos v. Berryhill*, No. 17-CV-01707, 2019 WL 4044277, at *9 (D.D.C. June 3, 2019), *R&R adopted*, 2019 WL 3451313, at *9 n.8. (D.D.C. July 31, 2019) ("[T]he record does not establish that Plaintiff is entitled to benefits.  Rather, it is more appropriate to remand the matter to the SSA to allow the ALJ [ ] the opportunity to evaluate the evidence he apparently overlooked and 'more fully explain his reasoning.'")[7]  Defendant proffers no specific support for its allegation that the record in this case does not indicate disability, even while conceding that the ALJ failed to follow this Court's instructions upon remand.[8]  Where the "Defendant no longer maintains that the decision was supported by substantial evidence and was reached through a proper application of existing law, [but instead] claims only that the evidence of record is not so clear as to mandate the payment of benefits, . . . Defendant virtually concedes that even he cannot support the ALJ's decision." *Ademakinwa v. Astrue*, 696 F. Supp. 2d 107, 112 (D.D.C. 2010) (internal quotation marks omitted).

Nor does Defendant proffer any substantive response to Plaintiff's arguments.  Plaintiff asserts that "[m]eaningful, substantive response is required or the argument is waived."  Pl.'s Reply, ECF No. 18, at 5; *see, e.g., Petro Star, Inc. v. FERC*, 835 F.3d 97, 103 (D.C. Cir. 2016) (agency was required to offer meaningful response to Plaintiff's arguments); *Kenner v. Berryhill*,

---

[7] Plaintiff indicates that two types of remands are possible pursuant to the fourth sentence of Section 405(g), which authorizes a court to enter "a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

[8] Plaintiff proffers additionally that after the second HOD was issued on October 16, 2020, the Appeals Council had the opportunity to address the defects of the decision but elected not to do so.

316 F. Supp. 3d 530, 538-539 (D.D.C. 2018) (SSA "failed to respond  to two of the arguments addressed in detail by Plaintiff," and thus, "this court has no alternative other than to find that Defendant has conceded Plaintiff's arguments"); *Ademakinwa*, 686 F. Supp 2d at 112 (finding a remand unwarranted, in part because "Defendant has suggested no basis upon which an ALJ could reach a finding favorable to Defendant regarding Plaintiff's RFC, or the existence of jobs in significant numbers in the national economy which she can perform").

This Court acknowledges that Defendant has not addressed the Plaintiff's arguments but instead, Defendant has elected to request that the Court once again remand this case to the ALJ for further consideration of issues which the ALJ clearly ignored on the first remand.  This Court recognizes that while Defendant has not suffered any harm, Plaintiff has been without benefits for almost ten years, and she indicates that she is "especially vulnerable to delay" because of her medical conditions and the COVID epidemic.  Def.'s Reply, ECF No. 18, at 7.  However, because the standard for an order of reversal involves a rather high bar, this Court prefers not to rely on Plaintiff's argument that Defendant has "implicitly concede[d] [P]laintiff's  argument." *Hawkins v. Massanari,* No. CIV. A. 00-2102, 2002 WL 379898, at *5 (D.D.C. Mar. 8, 2002).  Instead, this Court now turns to Plaintiff's allegations that the ALJ's alleged errors warrant reversal in this case and a remand for calculation of benefits.

### IV. Plaintiff Challenges the Second HOD on Several Grounds

Plaintiff contends that: (1) the ALJ's HOD contains multiple factual inaccuracies; (2) the ALJ failed to assess the frequency and duration of Plaintiff's symptoms; and (3) the ALJ required objective corroboration of subjective complaints and he failed to accord at least substantial weight to treating physicians.  Pl.'s Mem., ECF No. 15-1, at 17.  Plaintiff asserts that an ALJ "must discuss the frequency, duration, and severity of the claimant's symptoms and treatment." *Id.* at 15; *see,*

*e.g.,* 20 C.F.R. § 404.1529(c)(3); *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (explaining that the "substantial evidence" standard requires review of the record to determine if it substantiates "the story the agency's decision would have it tell"); SSR 96-9p: *Residual Functional Capacity for Less Than a Full Range of Sedentary Work*, 1996 WL 374185, at *6 (July 2, 1996)(mandating that "an accurate accounting of a claimant's abilities, limitations, and restrictions is necessary to determine the extent of erosion in the occupational base").

### A. The ALJ Misstated Facts

### 1. Plaintiff's Testimony

 Plaintiff notes that the ALJ indicated that she could:

> help her children with their homework, wash dishes, perform gardening, grocery shop, shop online, play games with her children, walk for an hour, read for an hour, downhill ski, attend Spring Break in Costa Rica with her family, attend a play, lead her daughter's Girl Scout troop meeting, attend a graduation ceremony, and vacation in Paris, France. . . [successfully pursue and complete extensive] writing, [go] downhill skiing at Seven Springs Resort in Pennsylvania (again), travel by train to New York, tak[e] a photography class, read[ ] 30 pages a day of Ernest Hemingway's [] "The Paris Wife," travel[ ] to Texas, work on a computer, travel[ ] to Tunisia in North Africa, draw[ ], attend[ ] a Capital's [sic] hockey game at Verizon's [sic] Center, view[ ] her daughter's ballet recital via "Skype," driv[e] to Annapolis, Maryland from her home in Washington, D.C., a route that requires her to drive on various interstate highways, and play[ ] ping pong. . .

AR 1571-1572.  The ALJ noted further that "claimant was able to travel internationally without any regard to her IV Saline infusions."  AR 1578.

> In contrast, Plaintiff asserts that:

> Since her disability onset in October 2012, Ms. Ruppert could do none of those things, or anything else without frequent rest periods [every] 10-60 minutes, frequent medical visits, and 2.5 to 4-hour saline IV infusions almost every afternoon, even when traveling. She testified she usually could perform activities only in the morning with breaks for rest (every 10-60 minutes with rest for 15 minutes or longer).  She **never**, as the ALJ inaccurately claimed, engaged in extensive writing, completed a photography class, AR 1617-1618, or worked on a computer or read from more than 10-30 minutes a day in the period at issue. She had to leave the hockey game he referenced.  She collapsed while leaving, had to be carried out, and did not recover for days.  AR 2160.  She could not attend her daughter's ballet recital in person - - and was unable to watch it on Skype.  AR 1625.  It was very rare

that Ms. Ruppert, if she felt well, could walk even an hour in a day by taking it in 20-to-25 minute segments.  AR 1630.  Her attempt at skiing (in 2019, after the period at issued) ended in disaster. [And furthermore,] . . . [the ALJ] had no evidence regarding her route [to Annapolis] or how often she drove herself. . . . In any event, Ms. Ruppert did not drive at all unless she was having a good week with no symptoms.  She had periods of months, even years, when she did not drive at all.  AR 1625-1635.  [And, finally,] ALJ Emerson inaccurately assumed that Ms. Ruppert played competitive ping pong.  AR 1582.  (Dr. Jacobs recommended slow ping pong and short computer games as visual therapy.)  ALJ Emerson grossly mischaracterized the evidence.

Pl.'s Mem., ECF No. 15-1, at 18-19.

This Court finds that the ALJ's characterization of Plaintiff's activities is inconsistent with the record and/or it leaves out pertinent facts.  For example, in addition to the contradictory testimony highlighted by Plaintiff above, the Court notes additional inconsistencies between what Plaintiff said and how the ALJ characterized it.  Plaintiff testified that she never had her daughter's Girl Scout meeting in her home.  AR 66.  She didn't have to help with homework because "[her kids] d[id]n't need [her] help."  AR 65.  She "like[d] to be the one that makes breakfast" but '[t]hen usually the kids w[ould] clean up the breakfast dishes or my husband [would]" while she "rest[ed] for a little bit[.]"  AR 63. Plaintiff testified that she was able to drive to her appointment with Dr. Weiss in Annapolis "a handful of times[.]"  AR 1613.  Sometimes while driving, she had to "pull over into a gas station and [ ] park and [ ] lay down the seat and [ ] rest[,]" and on two occasions, she "left the car[.]"  AR 1614.

With regard to skiing, Plaintiff decided to set a goal for herself after her 81-year old father-in-law had knee surgery and went down the slope.  AT 1615.  It was a "five minute slope," and she talked to her doctors and they put conditions on her, and in 2017, she was too weak to "get up the practice slope and hold the poles.[.]"  AR 1615.  She tried again in 2019, and she was able to do a couple of runs with rest (for about 20 minutes of activity) before she got tired and off balance and realized that "it's time to give up skiing."  AR 1616-1617.

When traveling by plane, Plaintiff wore an eye mask and used white noise earphones during takeoff.  AR 1618. When Plaintiff traveled domestically to places where her family lives (Texas and California), she had a "larger vitamin C beforehand so [she was] in good shape and she went on the plane "with access" carrying a bag with her infusions in it.  AR 1620.  With international travel such as Paris, she had a doctor friend who checked on her and access to a nurse and she had needles and her saline there.  *Id.* In Costa Rica, she did her infusions while sitting out by the pool at the "bed and breakfast" lodging where she was staying.  AR 1621.  While in Costa Rica with her family, Plaintiff "relaxed by the pool" while her "kids went to some trails," and she noted that she was able to "go bird watching."  AR 66.   In Tunisia, where her husband went for a business trip, they had a driver and "most of [her] time was [spent] in the hotel" as they were alerted to her situation beforehand.  AR 1621.   Accordingly, the Court finds that the ALJ misconstrued and mischaracterized much of Plaintiff's testimony with the effect that he made it appear that her daily activities were more extensive and unlimited than they actually were.

### 2. Dr. Weiss

With regard to his analysis of Dr. Weiss, the ALJ made a series of misleading statements and assumptions.  For example, the ALJ indicated that there are minimal primary care records [from Dr. Weiss] to document an ongoing treatment relationship with the Plaintiff.  AR 1578.  Dr. Weiss was Plaintiff's primary care physician, and he treated Plaintiff from approximately 2007 onward to at least 2016, developing her treatment plan for POTS and overseeing her treatment for post-concussive syndrome.  Plaintiff notes that "[t]here are hundreds of pages in the record from Dr. Weiss and his practice, AR 409-52, 878-905, 1100-05, 1143-84, 1267-75, 3008-3398, 3444-47."  Pl.'s Mem., ECF No. 15-1, at 18.  Some of these medical records were highlighted in this Court's January 13, 2020 Memorandum Opinion, ECF No. 19, at 4-9, 11, 17.  Despite the ALJ's

misleading statements to the contrary, Dr. Weiss consistently opined that Plaintiff could not engage in full-time work, and while he relied on Plaintiff's subjective reports of her symptoms, he also made clinical observations.  AR 1079, 1086, 1088, 1093, 1095, 1154, 1173, 1268, 1269, 1406-09, 3154, 3157, 3231, 3252-56, 3330, 3445-47.

Additionally, the ALJ's allegation that Dr. Weiss "concedes that there is not a substantial amount of objective evidence to support such substantial limitations (Exhibit 29F/3)," AR 1578, is not accurate.  "Dr. Weiss said nothing that even remotely suggested a paucity of supportive evidence - - at that page or elsewhere."  Pl.'s Mem., ECF No. 15-1, at 21.  Furthermore, the ALJ challenged Dr. Weiss's prescribing Plaintiff's infusions for 2:30 p.m. daily for 2.5 hours, on grounds that Dr. Weiss "did not provide a reason for not scheduling infusions outside of normal work hours[.]"  AR 1578.  This totally ignores Plaintiff's testimony about why the infusions were scheduled for daytime as opposed to after work hours.  *See* AR 1609-1613 (where Plaintiff indicated that she needed to prepare for and have the infusions when she was alert, and furthermore, if she tried to work for a few hours pre-infusion, the visual focus might trigger migraines and dizziness, and after an hour or two of activity, she would become exhausted).[9]

In summary, the ALJ's summary of Plaintiff's daily activities is not entirely consistent with the record in the case and/or it leaves out some pertinent facts.  Furthermore, the ALJ made unsupported and misleading statements about Plaintiff's treating physician, Dr. Weiss. Accordingly, the Court finds that the ALJ's misstatement of facts, which weighed into his ultimate finding that Plaintiff was not disabled, is one ground for reversing the ALJ's finding that Plaintiff is not disabled.

---

[9] Plaintiff distinguished between her infusions for POTS pre-concussion and post-concussion.

**B. The ALJ Required Corroboration of Subjective Complaints**

Plaintiff asserts that the ALJ ignored the definition of "objective medical evidence" in 20

C.F.R. Section 404.1502(f) and (g) (emphasis added by Plaintiff):

(f) *Objective medical evidence* means signs, laboratory findings, or both.
(g) *Signs* means one or more anatomical, physiological, or psychological abnormalities that can be **observed**, apart from your statements (symptoms).  Signs must be shown by medically acceptable clinical diagnostic techniques.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown **by observable facts that can be medically described and evaluated.**

Plaintiff points to two quotes that the ALJ included in his HOD: (1) "The claimant had

other medically determinable impairments [post-concussion syndrome] but a review of the

objective medical evidence supports that they were not severe because they did not more than

minimally restrict the ability to perform basic work activity for the requisite duration[;]" and (2)

"The objective medical evidence supports functional limitations arising from the claimant's

physical impairments but not to the degree alleged by her."  Pl.'s Mem., ECF No. 15-1, at 25

(citing AR 1569-1570).

Plaintiff argues that because she had already established medically determinable

impairments, the ALJ "could not reject the severity of her associated symptoms solely on the basis

of 'objective medical evidence.'"  *Id.; see Arakas v. Commissioner, Social Security Administration*

983 F.3d 83, 95-96 (4th Cir. 2020) (rejecting the improper insistence on "objective"

corroboration), at 97 (discussing the medical condition of fibromyalgia and citing cases from

various circuits illustrating that "ALJs may not discredit a claimant's subjective complaints , , ,

based on a lack of objective evidence substantiating them").  Moreover, in the instant case, there

*was* "objective medical evidence" as Plaintiff's physicians conducted tests and observed her

fatigue, poor attention span, confusion, inability to sustain activities such as reading, dizziness,

and other symptoms.  The medical records of Plaintiff's treating physicians, which are discussed in detail in this Court's January 13, 2020 Memorandum Opinion (Civil Action No. 18-0148) and incorporated by reference herein, are consistent with regard to Plaintiff's symptoms stemming from her POTS and post-concussive syndrome – symptoms which were reported by Plaintiff, and tested and treated by her physicians and therapists.  The outlier in terms of medical analysis appears to be Dr. Myerson, who conducted an independent medical examination and identified no specific physical functional impairments. Nor did he find Plaintiff's medical diagnoses supported by the records or his examination.   January 13, 2020 Memorandum Opinion, ECF No. 19, at 9. Nevertheless, the ALJ gave modest weight to Dr. Myerson's opinion, the same weight he accorded to many of Plaintiff's treating physicians, some of whom treated her for years, although notably, the ALJ cherry-picked portions of some of their medical opinions that aligned more closely with his opinion, and he gave those portions more substantial weight. *See* AR 1578, 1580.[10]

Plaintiff asserts further that the ALJ "misinterpret[ed] 'objective evidence' in the context of medical opinions." Pl.'s Mem., ECF No. 15-1, at 26.  By way of an example [Plaintiff provides several examples, *see id.* at 26-30], the ALJ found that there were some inconsistencies in Dr. Clark's [neuropsychologist] opinions; he noted that her objective findings of the Plaintiff were mostly normal, and further, that her opinion arose from Plaintiff's subjective statements.  AR 1577. The ALJ stated also that there was no evidence of emergency or inpatient treatment.  *Id.* Accordingly, the ALJ gave modest weight to the opinions of Dr. Clark.  *Id.*  In her Memorandum, ECF 15-1, at 26-27, Plaintiff highlights some of Dr. Clark's findings:

---

[10] Furthermore, the ALJ gave substantial weight to an opinion proffered by Dr. Ward, a pain management physician.   AR 1580 (referencing Ex. 57F).  The undersigned finds no mention of a Dr. Ward in this exhibit, and in fact, the medical treatments noted in Ex. 57F are largely consistent with Plaintiff's medical conditions.

Dr. Clark opined in October 2014 that Ms. Ruppert, with a serious Global Assessment of Functioning Score of 50, was unable to work currently as her "physical status" needed to improve, AR 1096-1098.  In 2015, Dr. Clark opined that Ms. Ruppert had a current history of one or more year's inability to function outside a highly supportive living arrangement, with an indication of continued need for the same, due to mood disturbance, emotional liability, and impairment of impulse control, due to an organic mental disorder.  AR 1185-1187.  The doctor relied on clinical testing positive for concussion and neuropsychological test results establishing many processing speed and memory deficits more than three standard deviations below the mean, AR 382-382, 712.  Dr. Clark observed Ms. Ruppert to be emotionally labile and stressed during a September 2014 consultation.  AR 1008.  In other therapy sessions, the doctor observed cognitive distortions, significant difficulty in developing strategies to accept and deal with her situation and in using emotional regulation skills, and difficulties standing and walking.  AR 1013-1014, 1019, 1023.

Plaintiff asserts that the ALJ failed to identify the mostly "normal findings" he referenced and furthermore, that a "lack of emergency or inpatient treatment and the demonstration of good behavior in a professional setting . . . does not disprove serious symptoms (such as poor memory, poor processing speed, depression, or episodes of rage, confusion, fatigue) and no ability to function outside a highly structured setting."  Pl.'s Mem., ECF No. 15-1, at 27.   Moreover, it is unclear why the ALJ believed that a neuropsychologist "could not take clinical observations and patient complaints into account."  *Id.*

Plaintiff proffers another example of the ALJ's misinterpretation of objective evidence, which involves Dr. Carr, Plaintiff's physical therapist.  The ALJ found that Dr. Carr was an "[un]acceptable medical source," AR 1579, despite the fact that she is a "Doctor of Physical Therapy and Board Certified Orthopaedic Clinical Specialist."  Pl.'s Mem., ECF No. 15-1, at 28.  The ALJ gave her opinion modest weight, noting that "[w]hile physical therapy records detail the claimant's numerous subjective symptoms, they do not show any objective abnormalities with transferring from supine to sitting or sitting to standing."  AR 1579.  Plaintiff challenges this statement as  "factually inaccurate" because "Ms. Ruppert demonstrated tachycardia on transfers, AR 1359, and furthermore, the ALJ's statement ignores that Dr. Carr worked with Plaintiff "on

reading, walking, balance, using her head, neck and shoulders." Pl.'s Mem., ECF No. 15-1, at 28.

The ALJ does not mention that Dr. Carr tested and opined on Plaintiff's single-leg balancing and

her ability to read for a period of time, and twice opined that Plaintiff could not perform "prolonged

activity tasks" or "walk for an hour a few times a week without increased fatigue the following

day." AR 1358-1359. Instead, the ALJ again cherry-picked certain allegations (taken out of

context) that support his ultimate finding that Plaintiff is not disabled.

      Considering the examples cited by Plaintiff, first, the Court finds that the ALJ misapplied

the definition of "objective medical evidence" to require hard data type corroboration of Plaintiff's

subjective complaints. Second, while the ALJ asserted that certain physicians relied too heavily

on Plaintiff's subjective complaints, a review of the record indicates that there is a significant

amount of objective medical evidence in this case, much of which was not discussed by the ALJ,

although whether that was done purposefully or not is unclear. Moreover, the ALJ ignored the

consistency between the opinions of Plaintiff's physicians who treated Plaintiff on a regular basis

over a period of years, particularly when he assigned weight to their opinions. The "ALJ's failure

to consider uncontradicted, probative evidence that goes to the very heart of the case before him

dooms his opinion [because] [i]f there is one fundamental principle guiding judicial review of an

AL[J's] decision in a Social Security case, it is that the AL[J] may not ignore evidence inconsistent

with his opinion without explanation." *Hawkins v. Massanari*, 2002 WL 379898, at *6 (citing

*Martin*, 118 F. Supp. 2d at 15). The Court finds that these errors by the ALJ constitute error that

warrants reversal.

### C. The ALJ Failed to Assess the Frequency and Duration of Plaintiff's Symptoms and Her Time Off Work

      An ALJ must discuss the frequency, duration, and severity of the claimant's symptoms and

treatment. *See, e.g.,* 20 C.F.R. § 404.1529(c)(3); *SSR 16-3p: Evaluation of Symptoms in Disability*

*Claims,* 2017 WL 5180304, at *7 (Oct. 25, 2017); *SSR 96-8p: Assessing Residual Functional Capacity in Initial Claims,* 1996 WL 374184, at *5 (July 2, 1996) (directing the ALJ to base his decision on the "effects of treatment, including limitations or restrictions by the mechanics of treatment (e.g. frequency of treatment, duration, disruption to routine, side effects of medication), . . .")  This Court ordered the ALJ, on remand, "to consider the calculation of Ms. Ruppert's time off work for documented medical and professional visits . . . [but] [h]e didn't."  Pl.'s Mem., ECF No. 15-1, at 18.  Plaintiff explains that the ALJ refused to apply a "productivity loss limitation" [calculation of Plaintiff's time off work] because she had "travel[ed] internationally," AR 1578.  Furthermore, the ALJ stated that:

> The undersigned has not included any off task or absenteeism limitations because although [Ms. Ruppert] had temporary periods of hospitalization or inpatient treatment, they did not reflect her long-term functioning over the period at issue . . . She testified that she could not do her infusions before normal working hours because of her symptoms but again, her medical records do not support her testimony.

AR 1579.

This Court notes that while Plaintiff was able to establish a workaround with her infusions when she worked at Booz Allen – *i.e.*, she could have a nurse administer the infusion through her port, while she was in the office with her feet up and the door closed, and she was provided additional time off and a more flexible (80%) work schedule, AR 71 – the ALJ seems to refuse to acknowledge that this is not the case with other employers.  *See* AR 1635 (where the vocational expert testified that an employer would tolerate no more than one day off per month and 10% off-task behavior); AR 76 (where the vocational expert testified that an individual would typically not be able to do an IV infusion at work and an employee who needed to miss a day per week for infusions would be unemployable).

Furthermore, while the ALJ rejected Plaintiff's need for rest breaks when he asserted that there was "no mention of [Plaintiff] needing rest breaks or an assistive device to perform the degree of walking reported by her," AR 1575, Ms. Ruppert's need for frequent rest was well-documented in the medical records. AR 386-88. Her METS testing [a fitness test] had to be stopped and cognitive testing broken up due to overwhelming fatigue. AR 378, 460. Dr. Hertzfeld placed her on brain rest. AR 324, 330. Drs. Clark and Jacobs observed fatigue on multiple occasions. AR 378-379, 384-386, 3420, 3454, 3462, 3464-3466. Dr. Weiss had a room set aside in his office so that she could rest upon coming in and before going home. AR 3445. Plaintiff's loss of focus and difficulties walking or standing were noted in the records. AR 3445. Drs. Clark and Weiss observed that she was fatigued and they instructed her to pace herself and rest frequently. AR 378-379. 382, 384-385, 387, 3157.[11]

Plaintiff argues further that the time off work needed for her medical visits would have precluded regular and continuous full-time employment, pointing to 2013 when she was "intermittently absent . . . for the equivalent of a month and a half solely for professional treatment," and 2014, when she had "approximately 88 such professional visits – totaling at least 176 hours (more than a month of absences)." Pl.'s Mem., ECF No. 15-1, at 37-38.

This Court finds that the ALJ failed to weigh Plaintiff's time off-task that would be required for Plaintiff's medical treatment (and visits), which would render her unemployable. This Court finds that Defendant has provided no explanation for the ALJ's failure to address the calculation of Plaintiff's time off work and the resultant effect on Plaintiff's ability to work, despite the

---

[11] Plaintiff indicates that the rehabilitation consultant "determined Ms. Ruppert could not sustain employment, as she could only 'perform tasks 4-5 hours per day with 2-3 breaks of 5-10 minutes but on bad days, she could do 30 minutes of simple activity followed by a 60-minute break,'" Pl.'s Mem., ECF No. 14-1, at 34 (refencing AR 1579).

evidence in the record that Plaintiff required Saline IV infusions and other medical treatment on a regular basis, and that she required frequent rest breaks.   A finding of disability is warranted due to uncontradicted evidence of Plaintiff's inability to work full-time, *i.e.,* on "a regular and continuing basis, eight hours a day, for 5 days a week, or an equivalent work schedule." *See SSR 96-8p: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *1, 7  (July 2, 1996).[12]  Remanding this case to the ALJ – to have him do what he was already ordered to do but blatantly refused to do – makes no sense to this Court, particularly in light of the long delay suffered by Plaintiff [whose disability commenced in 2012] and the resulting prejudice to her.  A court may issue an order granting benefits without remand where, as here, the "evidence on the record as a whole is clearly indicative of disability and additional hearings would serve no purpose other than to delay the inevitable receipt of benefits[.]" *Hawkins v. Massanari*, 2002 WL 379898, at *6 (quoting *Johnson v. Callahan*, 968 F. Supp. 449, 465 (N.D. Iowa 1997)).  "[C]onditions supporting a reversal are present here [as] Plaintiff . . . has been entangled in the disability system for at least five years . . . [and] [i]n addition, the administrative record has been fully developed and new facts would not be explored on remand." *Ademakinwa v. Astrue,* 696 F. Supp. 2d 107, 112 (D.D.C. 2010) (internal quotation marks and citation omitted).  Accordingly, Plaintiff's Motion for Judgment of Reversal shall be granted and this case will be remanded to the Commissioner for calculation and payment of benefits.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
**UNITED STATES DISTRICT JUDGE**

---

[12] In the instant case, as explained in detail herein, the ALJ's reversible errors include: (1) misconstruing facts that are relevant to Plaintiff's physical abilities and daily activities and relevant to Plaintiff's relationship with her treating physician (internist); (2) incorrectly applying the standard relating to objective evidence and then ignoring much of the objective evidence in the records; and (3) failing to calculate Plaintiff's time off work due to need for frequent rest, medical treatment and medical visits.